# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**ALMA L. TRAVIS (BOGGS),**

        **Plaintiff,**

**v.**
                                          **Civil Action No. 2:04CV91**
                                          **(The Honorable Robert E. Maxwell)**

**JO ANNE B. BARNHART,**

**Commissioner of Social Security,**

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

For reasons discussed below, the undersigned finds substantial evidence does not support the ALJ's decision, and therefore respectfully recommends this matter be reversed and remanded to the Commissioner.

## I. Procedural History

Alma L. Travis (Boggs) ("Plaintiff") filed an application for DIB on June 16, 1999, and an application for SSI on May 3, 1999, alleging disability since March 3, 1999, due to chronic severe pain secondary to L5 and S1 bulging discs and leg weakness (R. 62-64, 81, 331-33). Plaintiff's applications were denied at the initial and reconsideration levels (R. 40-41, 42-44, 52-54, 335-38, 339-42). Plaintiff requested a hearing, which Administrative Law Judge Edward Banas ("ALJ") held on September 14, 2000, and at which Plaintiff, represented by Montie VanNostrand, Esquire, and Larry Bell, Vocational Expert ("VE") testified (R. 345-80). On February 23, 2001, the ALJ entered a decision, finding Plaintiff met the requirements of sections 12.04 and 12.07 of the listed impairments and, therefore, was disabled on July 20, 2000 (R. 32, Finding Number 4). The ALJ found, however, that prior to July 20, 2000, Plaintiff had the residual functional capacity to perform a significant number of light jobs that had been identified by the VE and was therefore not disabled under the Act prior to July 20, 2000 (R. 33, Findings Numbered 12 and 14). Subsequent to this decision, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner (R. 7-9).

Plaintiff filed her complaint in the United States District Court in the Northern District of West Virginia on December 2, 2004 [Docket Entry 1]. On February 7, 2005, Defendant answered the complaint [Docket Entry 6]. On February 9, 2005, the District Judge ordered the parties' motions of summary judgment filed in accord with LR Gen. P. 83.12 [Docket Entry 7]. On April 1, 2005, Plaintiff filed a Motion for Leave to File Motion for Summary Judgment and Supporting Brief out of Time, and on April 21, 2005, Plaintiff filed her Motion for Summary Judgment with supporting brief [Docket Entries 8, 9]. On April 28, 2005, the District Judge referred the instant case

to the undersigned [Docket Entry 10]. On May 12, 2005, Defendant filed her Motion for Summary Judgment with supporting brief [Docket Entry 12]. On May 16, 2005, the undersigned entered an order granting Plaintiff's Motion for Leave to File Motion for Summary Judgment out of Time and ordered same filed on or before May 20, 2005. The undersigned ordered Defendant to file her Motion for Summary Judgment within thirty days of service of Plaintiff's motion [Docket Entry 13]. Neither Plaintiff nor Defendant filed subsequent motions for summary judgment.

## II. Statement of Facts

Plaintiff was born on January 12, 1951, and was forty-nine years old in July, 2000 (R. 62, 65, 331). Plaintiff has a high school diploma, an associate degree in nursing, and a license and past work experience as a registered nurse (R. 351).

Plaintiff's past medical history included the following: 1) hysterectomy in 1974; 2) excision of cyst in left ovary in 1979; 3) removal of right ovary in 1980; 4) gall bladder removal in 1981; 5) bilateral carpal tunnel release surgery in 1991; 6) exploratory laparotomy for correction of extensive intra-abdominal adhesions in 1993; 7) excisional biopsy in both breasts in 1994, resulting in a diagnosis of fibrocystic disease of both breasts; 8) examination by Sally Stewart, D.O., in 1995, which resulted in an assessment of "Probable Fibromyalgia;" 9) treatment for anxiety and depression in 1996 when her father was a patient in a hospital's emergency department, which resulted in an increase in her dosage of Prozac; and 10) diagnosis of urinary incontinence in 1996 (R. 136, 141-42, 144, 180, 182-87, 190, 195-97, 208, 207, 221).

On March 6, 1997, Plaintiff was treated by Antoine Katiny, M.D., for bronchitis, back pain, smoking cessation, and weight loss (R. 302).

On June 17, 1997, Plaintiff presented to Dr. Katiny and complained she felt "bad – tired"

3

and that she had been "sweating a great deal." Plaintiff informed Dr. Katiny she "hurt all over" when she did not take her medication and she was "not depressed but not feeling good." Dr. Katiny's diagnosis was "FM" (fibromyalgia), for which he prescribed Lorcet, and depression, for which he prescribed Prozac (R. 302).

On January 8, 1998, Plaintiff returned to Dr. Katiny with complaints of sinus pain and "significant arthritic pain all over." Plaintiff informed Dr. Katiny that Rheumatrex helped her symptoms for "the first week," but she had stopped taking it because it caused hair loss. Dr. Katiny was diagnosed acute sinusitis and prescribed Cipro, Claritin, Lorcet, and Lescol (R. 301).

On February 17, 1998, Dr. Katiny diagnosed fluid retention, for which he prescribed Demadex; hyperlipidemia, for which he prescribed Lipitor; and fibromyalgia, for which he prescribed Plaquenil. He also prescribed Lorcet, Prozac, and Premarin (R. 301).

On April 6, 1998, Plaintiff returned to Dr. Katiny with complaints of "diffuse body aches, especially in the bottoms of her feet and in the low back area" and pain in the joints of her arms and both hands. Plaintiff reported to Dr. Katiny that she could not grasp the steering wheel of her car and drove by using her thumbs only. Dr. Katiny observed Plaintiff's hands "show[ed] significant tenderness with some swelling" and she had "[m]ild low back tenderness." Dr. Katiny discussed the "side effects of using controlled substances;" specifically, he discussed the "habit forming effect and rebound pain associated with the long term use of . . . medications." He prescribed Lorcet and Anaprox and discontinued Plaquenil (R. 300).

On May 26, 1998, Plaintiff returned to Dr. Katiny for a refill of her prescriptions. He diagnosed acute sinusitis and prescribed a Z-Pack and Zyrtec to Plaintiff. Dr. Katiny also diagnosed diffuse muscular/skeletal pain and fibromyalgia. He refilled Plaintiff's prescription for Lorcet,

4

estrogen, and Prozac. He ordered a lipid profile (R. 300).

On June 13, 1998, Plaintiff presented to Doctor's Quik Care [sic] for bilateral shoulder and back pain, arthritis, and fibromyalgia. She was treated by Victoria Shuman, D.O. (R. 210). Dr. Shuman advised Plaintiff to take her medication as directed, rest, and follow-up with her family doctor (R. 211).

On June 14, 1998, Plaintiff returned to Doctor's Quik Care with complaints of lower abdominal pain. Plaintiff stated she felt as if "her bladder may have dropped again." Examination of Plaintiff revealed "mild suprapubic tenderness," no rebound tenderness, no "CVA" tenderness, negative rectal examination, tenderness on pelvic examination, and no obstruction. Plaintiff was diagnosed with abdominal pain with lukocytosis, prescribed Cipro, and instructed to "follow-up with Dr. Gruspe in the a.m." (R. 214).

On June 15, 1998, Plaintiff presented to Dr. Katiny with lower back and abdominal pain. Dr. Katiny noted that acute cystitis should be considered. He instructed Plaintiff to get the prescription for Cipro filled; he prescribed Lorcet and Diflucan (R. 299).

On August 19, 1998, Plaintiff returned to Dr. Katiny for refills of her prescriptions. She complained of diffuse aches, body pains, and "knots on her right hand and right shoulder." Dr. Katiny diagnosed "consider" fibromyalgia. He prescribed Lorcet and refilled her "regular medication" (R. 299).

On September 10, 1998, Dr. Katiny prescribed Lorcet to Plaintiff (R. 299).

On September 29, 1998, Plaintiff presented to Dr. Katiny with complaints of "aches and pains all over her body." Plaintiff stated she experienced "more pain now in her back." Plaintiff stated she had medicated the pain in her back two years ago, and the condition had resolved. Dr.

5

Katiny observed mild to moderate tenderness in Plaintiff's sacral area. Plaintiff's muscle strength was 5/5 throughout and she could bend her back to forty degrees. Dr. Katiny assessed rheumatoid arthritis and back pain. He prescribed Plaquenil, Lorcet, and Robaxin, but without refills. Plaintiff informed Dr. Katiny "she needed a shot of Stadol 1mg IM." Dr. Katiny injected Plaintiff with Kenalog 2ml (R. 298).

On October 20, 1998, Plaintiff returned to Dr. Katiny for a follow-up examination for fibromyalgia, back pain, and arthritis. Plaintiff stated she continued to have diffuse pain, especially in her low back area. Dr. Katiny noted sinus tenderness, sinus pain, sinus drainage, and moderate low back tenderness. He assessed chronic low back pain, for which he prescribed Lorcet, and acute sinusitis, for which he prescribed Cephalexin (R. 298).

On November 12, 1998, Plaintiff presented to Dr. Katiny with complaints of occasional episodes of migraine headaches and continued low back pain. Plaintiff requested an Imitrex shot from Dr. Katiny for treatment of her headache. Dr. Katiny diagnosed migraine headache and injected Plaintiff with Imitrex 6mg. Dr. Katiny also diagnosed chronic low back pain, for which he prescribed Lorcet (R. 297).

On November 30, 1998, when Plaintiff presented to Dr. Katiny with a right earache, nasal drainage, and sinus drainage, she was prescribed Z-Pack, Claritin, and Lorcet (R. 297).

On January 4, 1999, Plaintiff returned to Dr. Katiny with complaints of low back pain and pressure and pain in her pelvic area, vagina, and bladder. Dr. Katiny observed mild lower abdominal tenderness and mild tenderness of L-S spine area. Dr. Katiny assessed low back and pelvic pain. He prescribed Lorcet and referred Plaintiff to Dr. Swisher for pelvic pain (R. 297).

On February 4, 1999, Plaintiff presented to Dr. Katiny with complaints of persistent low

back pain. He observed mild to moderate tenderness in Plaintiff's low back area. He assessed low back pain. He provided samples of Vicoprofen and ordered an MRI of Plaintiff's back (R. 296).

On February 9, 1999, an entry was made in the medical notes of Dr. Katiny relative to Plaintiff's prescription refill. A pharmacist from "Rite-Aid Webster" phoned Dr. Katiny's office to inform the doctor he had refused to refill a prescription which had been phoned in on January 8, 1999, as it "was to [sic] soon to fill since there had been one filled on 1/4/99." Dr. Katiny was informed and he stated he "would call and council [sic] her on taking to [sic] many perscribed [sic] pain pills" (R. 296).

On March 2, 1999, Plaintiff returned to Dr. Katiny with complaints of persistent low back pain. Dr. Katiny observed "significant tenderness of L-S Spine area." Dr. Katiny also noted "multiple points of tenderness over [Plaintiff's] shoulders and elbows and legs." He assessed fibromyalgia. He prescribed Vicoprofen with no refills. He also noted he would "start her on Neurontin 300mg . . . " and schedule a spinal MRI (R. 295).

On March 22, 1999, Plaintiff was examined by Dr. Katiny for sinus pain and drainage. Plaintiff informed the doctor she needed "refill on her pain pills." Dr. Katiny assessed acute maxillary sinusitis, for which he prescribed Augmentin and Claritin, and fibromyalgia, for which he prescribed Lorcet, with no refills (R. 295).

On March 25, 1999, Plaintiff underwent a MRI of her lumbar spine. H. G. Cruz, M.D., interpreted the MRI and opined it revealed disc bulging and desiccation at L5-S1 with no focal disc herniation (R. 218). A x-ray of Plaintiff's lumbar spine taken that same day revealed mild degenerative changes of the lumbar spine (R. 291).

On April 8, 1999, Plaintiff presented to Dr. Katiny with complaints of persistent and continuing low back pain. Plaintiff requested "Detrol for her bladder and refill on Prozac." Dr.

Katiny assessed low back pain, for which he prescribed Lorcet; overactive bladder, for which he prescribed Detrol; and depression, for which he prescribed Prozac. Dr. Katiny discussed the "no surgical indication" results of Plaintiff's MRI with her (R. 294).

On April 26, 1999, Plaintiff was examined by Dr. Katiny for low back pain, right earache, and itching sensation. Plaintiff informed Dr. Katiny that Lorcet helped "ease up the pain and it [was] the only thing helping." Dr. Katiny observed mid and lower back tenderness and assessed mid and low back pain, for which he prescribed Lorcet (R. 294).

On May 13, 1999, Plaintiff presented to Dr. Katiny with complaints of continued low back pain. She informed the doctor that "Neurontin did not help significantly but Lorcet helps." Dr. Katiny observed low back tenderness. He assessed chronic low back pain and prescribed Lorcet (R. 293).

On June 1, 1999, Plaintiff underwent an x-ray of her lumbar spine. A. A. Goodarzi, M.D., interpreted the x-ray, noting Plaintiff had no apparent fracture, no distortion of curvature, and no disc space narrowing. He opined the x-ray shoed hyperlordosis with scoliosis, but "both . . . could be positional and/or functional in nature (muscle spasm, etc.)." He suggested a CT Scan (R. 236).

Also on June 1, 1999, Nunzio P. Pagano, D.C., corresponded with Plaintiff's case manager at the West Virginia Workers' Compensation Fund relative to the reopening of her Workers' Compensation claim (R. 237). Dr. Pagano's examination of Plaintiff revealed pain on palpation of the spinous processes at the lower three lumbar segments and both sacroiliac joints. Plaintiff could touch her toes. Hyperextension was twenty to thirty degrees. Lateral bending on right was thirty degrees and twenty-five degrees on the left. "SLR test was 60 degrees on the left and 40 on the right." The Valsalva maneuver, Iliac compression test, and Soto Hall's test were positive. No

8

gross sensory deficits were revealed in either lower extremity. "Weakness [was] noted in muscle strengthening test in both lower extremities" (R. 238).

Dr. Pagano's impression was that Plaintiff had a chronic condition and that she undergo a course of chiropractic treatment, which included spinal adjustments, exercise, and therapeutic modalities. Dr. Pagano estimated Plaintiff would realize "measurable positive results" in a four week period (R. 238).

On June 17, 1999, Plaintiff returned to Dr. Katiny with complaints of chronic back pain. Plaintiff informed Dr. Katiny she "consumed 2 months worth of Lorcet, i.e., 240 pills in 1 month only." Dr. Katiny assessed back pain. He counseled Plaintiff regarding "taking too many pain pills" and advised her "this is very harmful to her liver because it contains a lot of Acetaminophen." Dr. Katiny informed Plaintiff he would prescribe only one month supply of Lorcet "on the condition that she agree to go to a pain management clinic." He prescribed Lorcet, 120 pills, no refills, and secured a July 7, 1999, appointment at the pain clinic located in Charleston, West Virginia (R. 293).

Plaintiff returned to Dr. Katiny on July 15, 1999, with complaints of back pain, sinus congestion, and sneezing. She informed Dr. Katiny she was taking Ibuprofen in addition to Lorcet, and the combined effects of the drugs "barely phase[d]" her pain. Dr. Katiny diagnosed fibromyalgia and acute sinusitis, prescribed Lorcet, and provided samples of Celebrex, Augmentin and Claritin to Plaintiff. Dr. Katiny counseled Plaintiff on her being "very careful taking any further Tylenol because she is reaching critical level of Acetaminophen congestion" (R. 292).

On August 10, 1999, Plaintiff presented to Dr. Katiny with chronic low back pain. Plaintiff stated she could not function without taking pain pills. Dr. Katiny observed mild tenderness in Plaintiff's mid back area. He diagnosed chronic low back and mid back pain and prescribed Lorcet

(R. 291).

An August 24, 1999, x-ray of Plaintiff's lumbar spine showed "normal alignment of the lumbar spine;" "narrowing of L5, S1" but normal remaining interspaces; no "appendicular defect;" and normal sacroiliac joints (R. 246).

Also on August 24, 1999, Arturo Sabio, M.D., completed a consultative examination of Plaintiff for West Virginia Disability Determination Service. Plaintiff's chief complaint was low back pain. Plaintiff noted the following symptoms and limitations: cannot bend, cannot lift, cannot push, sudden right leg weakness, constant aching in lumbar spine, lumbar spine pain radiates to legs, incontinence, pain with repetitive bending and stooping, pain with repetitive lifting, could sit for fifteen minutes, and could ride in a car for one hour (R. 240-41). Plaintiff stated she experienced constant low back pain, which she medicated with Lorcet, 10mg. Plaintiff informed Dr. Sabio she realized "significant relief [with Lorcet] that permits her to sleep and permits her to move about and do her household chores" (R. 240).

Dr. Sabio noted Plaintiff smoked one and one-half packages of cigarettes per day and took the following medications: Lorcet, Prozac, and Premarin (R. 241). Dr. Sabio observed Plaintiff was oriented to time, place, and person; ambulated with a normal gait and without aids; and was stable at station (R. 242). Dr. Sabio opined Plaintiff's head, eyes, ears, nose, throat, neck, cardiovascular, chest, abdomen, and extremities examinations were normal (R. 242-43). Dr. Sabio observed tenderness over Plaintiff's thoracic first, second, and third vertebrae, but he observed no kyphosis or scoliosis. Plaintiff's range of motion testing revealed the following: cervical spine allowed forty-five degrees of flexion, forty-five degrees of extension, and forty-five degrees of lateral rotation on either side; lateral flexion was forty-five degrees bilaterally; shoulders allowed one-hundred-eighty

10

degrees of forward flexion and abduction bilaterally; elbows allowed one-hundred-fifty degrees of flexion and zero degrees of extension bilaterally; wrists allowed eighty degrees of flexion and seventy degrees of extension bilaterally; and all hand joints allowed ninety degrees of flexion (R. 243). Plaintiff's straight-leg raising test was forty-five degrees bilaterally (supine, restricted by lumbar spine pain); straight leg raising was ninety degrees bilaterally (sitting, pain in lumbar spine); lumbar spine flexion was ninety degrees forward (pain in lumbar spine) and twenty degrees of lateral flexion to either side; hips allowed one-hundred degrees flexion bilaterally; knees allowed one-hundred-fifty degrees of flexion and zero degrees of extension bilaterally; and ankles allowed twenty degrees of dorsiflexion and forty degrees of plantar extension bilaterally. Dr. Sabio's neurological examination of Plaintiff revealed grossly normal cranial nerves, sensory function intact throughout, 5/5 motor strength in all extremities, hand grips of twenty-six KGF on the right and left, normal Babinski reflex, ability to walk on heels and toes separately but not in tandem, full squat, well preserved fine manipulation movements, and inability to stand on either leg separately. Dr. Sabio's impression was degenerative disc disease, osteoarthritis, and osteoporosis (R. 244).

On September 7, 1999, Plaintiff presented to Dr. Katiny with complaints of significant low back pain. Plaintiff refused referral to a pain clinic because she could not afford to pay for treatment. Plaintiff treated her pain with six Lorcet tablets per day. Dr. Katiny assessed chronic low back pain and prescribed Lorcet and Oxycontin. He provided Plaintiff with samples of Prozac. Dr. Katiny counseled Plaintiff "about the possible long term side effects of taking too much Lorcet" (R. 291).

On September 16, 1999, Plaintiff was evaluated by Syed A. Zahir, M.D. He observed tenderness at Plaintiff's lumbosacral junction. Plaintiff's straight leg raising test was up to ninety degrees and she had normal sensation to pinprick in both lower extremities and normal motor power

in both feet, ankles, knees, and hips. Dr. Zahir diagnosed chronic low back pain and possible herniated disc at L5-S1 and L4-5 (R. 247). Dr. Zahir opined Plaintiff would not be able to do any type of work that required heavy lifting, pushing and/or pulling, or frequent bending or stooping. Dr. Zahir opined Plaintiff could perform "alternate" work to registered nursing that required "sedentary type work, with no frequent bending, stooping, heavy lifting, pushing or pulling." He noted Plaintiff was "not totally disabled," but "partially disabled," and her restrictions were "temporary, until such time that she recovers completely." Dr. Zahir recommended Plaintiff be examined by a neurosurgeon for "further diagnostic work-up for herniated disc," receive treatment at a pain clinic, reduce her weight, and wear "LS support" (R. 248).

On September 28, 1999, Plaintiff reported to Dr. Katiny with a sinus condition and for refills of her prescriptions. He diagnosed acute sinusitis and bronchitis. Dr. Katiny prescribed Lorcet and provided samples of Augmentin and Claritin to Plaintiff. Dr. Katiny advised Plaintiff "about smoking cessation" (R. 290).

Also on September 28, 1999, Fulvio R. Franyutti, M.D., a State agency physician, completed a Residual Physical Functional Capacity Assessment ("RFC") of Plaintiff. He found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and unlimited push/pull (R. 250). Dr. Franyutti found Plaintiff was limited to "frequent" climbing, balancing, stooping, kneeling, crouching, and crawling (R. 251). He found Plaintiff had no manipulative, visual, or communicative limitations (R. 252-53). He found Plaintiff could tolerate unlimited exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, but should avoid concentrated exposure

12

to extreme cold (R. 253). Dr. Franyutti found Plaintiff's RFC was for medium work (R. 254).

On November 1, 1999, Plaintiff presented to Dr. Katiny with complaints of sinus congestion, sore throat, and cough. She requested a refill of her medications. Dr. Katiny diagnosed acute bronchitis and sinusitis, provided samples of Augmentin and Claritin, and prescribed Lorcet. Dr. Katiny counseled Plaintiff about smoking cessation (R. 290).

On November 30, 1999, Plaintiff returned to Dr. Katiny. She stated she continued to experience "a lot" of low back pain and was "taking Lorcet around the clock." Plaintiff informed Dr. Katiny she had felt anxious and experienced "feelings of shame of being incapable to work." Dr. Katiny observed mild to moderate tenderness in Plaintiff's low back area and muscle strength of 4/5 to 5/5 throughout. Dr. Katiny diagnosed chronic low back pain, for which he prescribed Percocet and Oxycontin, and anxiety, for which he prescribed Ativan and provided samples of Prozac. Dr. Katiny counseled Plaintiff about the effect of Acetaminophen on her liver (R. 289).

On December 13, 1999, Plaintiff presented to Dr. Katiny with complaints of low back and leg pain. Plaintiff informed Dr. Katiny Percocet caused severe itching. Plaintiff stated she was experiencing coughing, congestion, and sinus drainage. Dr. Katiny diagnosed chronic low back pain, for which he prescribed Lorcet and Oxycontin, and acute sinusitis and bronchitis, for which he provided samples of Augmentin and Claritin. Dr. Katiny provided refill prescriptions of Plaintiff's Midrin and Premarin (R. 289).

On January 10, 2000, Plaintiff was examined by Dr. Katiny for sinus congestion. She informed Dr. Katiny that "Levaquin helped her a lot." Dr. Katiny assessed acute sinusitis, for which he prescribed Levaquin and Allegra, and back and leg pain, for which he prescribed Lorcet and Oxycontin. Plaintiff refused an x-ray or CT Scan of her sinuses (R. 288).

On February 3, 2000, Plaintiff presented to Dr. Katiny with sinus drainage, cough, congestion, low back pain, and fatigue. He observed mild to moderate tenderness in Plaintiff's low back area, post nasal drip, sinus tenderness, and scattered rhonchi without wheezing. He diagnosed low back pain, for which he prescribed Lorcet and Oxycontin, and acute bronchitis and sinusitis, for which he prescribed Levaquin and provided samples of Claritin D. Plaintiff requested a Rochephin 1gm shot, which Dr. Katiny provided. He advised smoking cessation (R. 288).

On February 8, 2000, Hugh Brown, M.D., a State agency physician, completed an RFC, finding Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and unlimited push/pull (R. 264). He found Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl (R. 265). He found Plaintiff had no manipulative, visual, communicative, and/or environmental limitations (R. 266-67). Dr. Brown found Plaintiff's RFC to be for medium work (R. 269).

On February 18, 2000, Alex Ambroz, M.D., conducted a consultative examination of Plaintiff relative to her Workers' Compensation claim. Plaintiff's chief complaint was back pain (R. 198). Plaintiff stated she could not work because of severe pain. She informed Dr. Ambroz she felt weak and tired. A review of Plaintiff's systems was normal (R. 201). Dr. Ambroz's examinations of Plaintiff's skin, head, ears, eyes, nose, throat, neck, heart, lungs, and extremities were normal. Dr. Ambroz observed tenderness in Plaintiff's lower back, some paravertebral muscle spasm, and pain on straight leg raising. He opined Plaintiff "was in obvious pain getting on and off the examination table" (R. 202). Plaintiff was alert and oriented; her cranial nerves were intact; her deep tendon reflexes were all "2+;" her motor strength was 5/5 in upper and lower extremities; and

14

her handgrips were 5/5. Dr. Ambroz observed Plaintiff could walk on her heels and toes, squat, and rise. Plaintiff's gait was normal. Dr. Ambroz opined Plaintiff's mental status was normal (R. 202).

Dr. Ambroz opined that "[n]either the Pain Drawing nor the short form McGill Pain Questionnaire revealed symptom magnification or functional overlay. On the Pain Disability Index, the score suggested a moderate/severe perceived impairment." Plaintiff scored in the sedentary/light work range on the Spinal Functional Sort Test (R. 202). Dr. Ambroz opined the "results of the pain and functional status inventories are consistent with the physical findings" (R. 202-03). Dr. Ambroz diagnosed chronic low back pain, chronic lumbar sprain, and depression, and assessed Plaintiff with a nine percent whole person impairment (R. 203).

On February 21, 2000, Plaintiff returned to Dr. Katiny with complaints of increased low back pain, radiating to her right leg. She had not gone to the pain management clinic or neurosurgeon consultation because the appointments entailed a two-hour drive and she stated she could not "do it." She told Dr. Katiny she had attempted to reopen her Workers' Compensation claim and was waiting for their evaluation to be done. She stated she wanted "Workers' Comp to take care" of paying for treatment at a pain clinic or by a neurosurgeon "rather than her medical card." Plaintiff asked Dr. Katiny to increase her Oxycontin dosage because she could not stay pain free on two doses per day. Dr. Katiny observed mild tenderness on Plaintiff's low back. He assessed chronic low back pain and right leg pain syndrome. He increased Plaintiff's dosage of Oxycontin and prescribed Lorcet and Robaxin. Dr. Katiny also diagnosed hyperlipidemia and prescribed Lipitor (R. 287).

On February 28, 2000, Rod McCullough, M.A., and Ronald D. Pearse, Ed.D., completed an Adult Mental Profile of Plaintiff. No medical records were available for the evaluators to review.

Plaintiff's presenting symptoms were sleep difficulty due to chronic pain, which resulted in diminished energy levels, her feeling depressed, and diminished appetite. Plaintiff informed Messrs. McCullough and Pearse that she medicated with Lorcet, Oxycontin, Prozac, Premarin, and Detrol. Plaintiff stated she had been married for sixteen years, was currently divorced, lived with her father and brother, and had been sexually abused by her paternal grandfather, but had no residual effects therefrom (R. 272).

Messrs. McCullough and Pearse observed Plaintiff's posture was rigid, gait was slow, eye contact was appropriate, verbal responses were appropriate, speech was relevant, mood was dysphoric, affect was restricted, insight was good, judgment skills were average, immediate memory was normal, recent memory was within normal limits, remote memory was intact, concentration was poor, attention was average, and abstract reasoning was average. Plaintiff was oriented times four, she denied suicidal or homicidal ideations, and she presented with no formal thought disorder (R. 273). The results of the WAIS-III revealed Plaintiff's Verbal IQ was 98; Performance IQ was 84; and Full Scale IQ was 91 (R. 273). The results of the WRAT-III test showed Plaintiff's reading and spelling levels were post-high school and her arithmetic level was seventh grade. Messrs. McCullough and Pearse noted Plaintiff's reported subjective symptoms were chronic pain with mild depression. They listed her objective symptoms as average intellectual abilities with no deficits in academic skills; dysphoric mood with no indication of a major mood disorder; and mildly deficient concentration. They diagnosed "depression effecting [sic] recovery from back injury" and determined Plaintiff's prognosis was fair (R. 274).

Plaintiff stated her activities of daily living included rising between 7:00 a.m. and 8:00 a.m.; maintaining personal hygiene; cooking; and cleaning, limited by back pain. Messrs. McCullough

and Pearse noted Plaintiff's social functioning interactions were appropriate, her concentration was poor, her persistence was good, her pace was acceptable, and her immediate and recent memory were within normal range. They determined Plaintiff could manage personal finances if benefits were awarded to her (R. 274-75).

On March 16, 2000, Plaintiff presented to Dr. Katiny with complaints of diffuse aches and pain. He observed tender multiple trigger points over Plaintiff's low back, upper back, shoulders, and elbows. His assessment was again "consider fibromyalgia." He prescribed Oxycontin, Lorcet, and Lipitor for Plaintiff's hyperlipidemia (R. 286).

On April 13, 2000, Plaintiff returned to Dr. Katiny with complaints of low back pain and concerns of having a "possible fatty tumor in the middle of her back." Dr. Katiny observed mild tenderness at Plaintiff's low back and "what seems like a fatty tumor on the right side of the lumbar area" which was one centimeter in size and nontender. Dr. Katiny opined Plaintiff had a fatty tumor, which he would observe, and low back pain, for which he prescribed Lorcet and Oxycontin. Plaintiff informed Dr. Katiny she had insomnia, for which he prescribed Ambien (R. 286).

On July 17 - 18, 2000, Plaintiff underwent a consultative examination, conducted by James Battisti, M.Ed., M.A., LSW, under the supervision of L. Andrew Steward, Ph.D. Plaintiff had been referred to Messrs. Battisti and Steward by her counsel, "for a psychological evaluation to assess [Plaintiff's] current level of functioning as it pertains to the appeal of her Social Security Disability claim" (R. 325). Plaintiff reported she was depressed because of pain, her medical condition, limitations to her activities, and inability to work. Plaintiff reported she was unable to sit or stand for long periods of time, was nervous, was anxious, and had difficulty sleeping. Plaintiff stated she had "some recent suicidal ideations," but as she was "a Christian, I wouldn't do it." Plaintiff

17

reported that she had been married twice, once for twelve days and once for sixteen years; had been sexually abused by her grandfather; was divorced; and was restricted in her activities of daily living and had limited social interaction (R. 326).

Messrs. Battisti and Steward noted Plaintiff was cooperative, polite, courteous, friendly, and "easily attained" a rapport with the them. They observed Plaintiff's "anxiety level was somewhat higher than appropriate," but she was oriented times four. Her mood was observed as dysphoric and her affect as broad. Her speech was relevant and coherent. Plaintiff's immediate, short-term, and long-term memories were without difficulties. The evaluators did observe Plaintiff's attention was somewhat limited and her concentration was mildly impaired (R. 327).

The WAIS-III indicated Plaintiff's Verbal IQ was 91; Performance IQ was 85; and Full Scale IQ was 88, or in the low average range of intellectual functioning (R. 327). On the MMPI-2, Plaintiff's valid scores revealed significant pathology in the form of depression, which indicated she was clinically depressed and experiencing feelings of helplessness; hypochondriasis, which indicated she had a high degree of concern for her physical well-being; and paranoia, which indicated she experienced paranoia, feelings of persecution, possible delusions, and withdrawal. The evaluators noted that "[t]hroughout [Plaintiff's] profile there [were] indications of possible psychosis, dependency, passivity, emotional lability, somatic concerns, a lack of insight, impulsivity, family issues, indecisiveness, introversions, and submissiveness." Plaintiff's overall clinical profile indicated thought disturbances, anxiety, depression, sleep disturbances, despondency, anger, and feelings of hopelessness (R. 328). Plaintiff scored as follows on the WRAT-3: reading was post-high school; spelling was post-high school; and arithmetic was eighth grade. Plaintiff's results on the BVMGT were for difficulties in curvature, crossing, preservation, size expansion, and

18

arrangement, but not at levels which indicated a neurological impairment. The Beck Depression Inventory indicated a moderate range of depression (R. 329).

Messrs. Battisti and Steward made the following diagnostic impressions: Axis I – pain disorder; mood disorder with major depressive-like episode; and anxiety disorder with generalized anxiety; Axis II – personality disorder NOS and paranoid personality disorder; Axis III – history of carpal tunnel syndrome, fibromyalgia, abdominal and back problems, sinusitis, bronchitis, hyperlipidemia, ovary and bladder problems, cysts, cholithiasis; Axis IV – divorced, medical problems, unemployed, low income; and Axis V – GAF of 50 (R. 329-30).

Messrs. Battisti and Steward made the following recommendations: medical referral of Plaintiff for further assessment of medical condition; psychiatric referral for further assessment of psychopathology; plan of intervention for assessment of expressed and exhibited emotional lability; psychotherapy sessions to address presenting problems; and evaluation for assessment of possible rehabilitation services (R. 330).

On July 20, 2000, Dr. Katiny completed a Residual Functional Capacity Assessment of Plaintiff. He noted Plaintiff's medical history included severe fibromyalgia, diffuse body aches, bladder suspension surgery, chronic low back pain, chronic/acute sinusitis, and depression. Dr. Katiny listed Plaintiff's "present" diagnoses as severe fibromyalgia with diffuse body aches and chronic back pain. Dr. Katiny wrote his diagnosis of fibromyalgia was based on "no specific diagnosis" and that his diagnosis of low back pain was based on "MRI: disc bulging & dissication [sic] @ L5-S1 vertebrae with degenerative disk disease and arthritis" (R. 304).

Dr. Katiny opined Plaintiff would not be able to perform heavy, medium, or light levels of work. He found Plaintiff was capable of performing sedentary work (R. 306). Dr. Katiny found

Plaintiff could sit for one hour at a time and for three hours in an eight-hour workday; could walk for one-half hour at a time and for one hour in an eight-hour workday; and could stand for fifteen minutes at a time and for one hour in an eight-hour workday. Dr. Katiny found Plaintiff could never climb, balance, stoop, kneel, crouch, crawl, stretch, reach, squat, or bend (R. 307). Plaintiff was found to be restricted in her exposure to jarring or vibrative machinery, excessive humidity, cold temperatures, and environmental hazards (R. 307-08). Dr. Katiny opined it would be necessary for Plaintiff to "take several periods of rest" during the day due to low back pain. Dr. Katiny found Plaintiff would be expected to experience moderate to severe chronic pain and intermittent pain that was severe. Dr. Katiny noted Plaintiff needed no assistive devices to walk or stand. He found Plaintiff needed to alter positions every fifteen to thirty minutes (R. 308). Dr. Katiny opined Plaintiff could use her hands to grasp but not for fine manipulation, but that she experienced loss of grip strength and numbness in her hands. Dr. Katiny found Plaintiff was unable to perform a full-time job because of "constant aches & pains (all body) – constant low back pain – numbness – depression" (R. 309). Dr. Katiny opined Plaintiff's "depression combined with her body pain cause greater discomfort" and that Plaintiff's "degree of impairments found . . . have [sic] been the same in 03/99 and have [sic] . . . lasted for at least 12 months" (R. 310).

On July 29, 2000, Messrs. Battisti and Steward completed a Psychiatric Review Technique ("PRT") form. They made no findings as to medical disposition(s) of Plaintiff, but found those categories that made up the medical disposition were organic mental disorders; schizophrenic, paranoid, and other psychotic disorders; affective disorders; anxiety related disorders; somatoform disorder; and personality disorders (R. 311). According to the form, Plaintiff's organic mental disorders manifested themselves in disturbance in mood, emotional lability, and impairment in

impulse control. Plaintiff's psychotic features were emotional withdrawal and/or isolation (R. 313).

Messrs. Battisti and Steward found Plaintiff's affective disorder was a disturbance of mood which was characterized by depressive syndrome (R. 314). Plaintiff was found to have anxiety related disorders which caused generalized persistent anxiety (R. 315). Plaintiff's somatoform disorders manifested themselves in a "history of multiple physical symptoms of several years duration . . . that have caused the [Plaintiff] to take medicine frequently . . .," "unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that [she] has a serious disease or injury," and pain. Plaintiff's personality disorder involved persistent disturbances of mood or affect and intense and unstable interpersonal relationships and impulsive and damaging behavior (R. 316).

The evaluators opined Plaintiff had a "marked" limitation in her activities of daily living and ability to maintain social functioning; was "often" limited in concentration, persistence, or pace; and had had one or two episodes of deterioration or decompensation, each of extended duration (R. 318).

Also on July 29, 2000, Messrs. Battisti and Steward completed a Mental RFC, finding Plaintiff was "not significantly limited" in her ability to remember locations and work-like procedures and ability to understand and remember very short and simple instructions, but was "moderately limited" in her ability to understand and remember detailed instructions (R. 320). Plaintiff was found to be "markedly limited" in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 320-21). She was found to be "moderately limited" in her ability to carry out detailed instructions and work in coordination with others without being distracted; her ability to get along with coworkers

21

or peers without distracting them or exhibiting behavioral extremes; and her ability to set realistic goals or make plans independently of others (R. 321).

At the administrative hearing on September 14, 2000, the following question/answer exchange occurred between the ALJ and the VE:

ALJ:    . . . [W]e have a hypothetical individual who is a younger individual, not yet age 50, has in excess of a high school education, completed several years of college and the hypothetical individual previously worked as a registered nurse, both in, you know, ICU and also in the regular nursing setting and the hypothetical individual suffers from all of the symptoms and limitations that the Claimant here today, during the hearing, stated that she suffered, what, if any, jobs could a person with that profile do?

VE:    Probably none. . . .

ALJ:    . . . What if I changed my hypothetical and this time – I don't know if you had an opportunity to take a look at Exhibit 25F – that's Dr. Katini's assessment – I'm going to pass that over to you and I would ask you to take a look at it and when you're finished looking at it, I would like you to tell me whether a hypothetical individual with a vocational background similar to that of the Claimant could do any work activity, you know, given the limitations specified by Dr. Katini? . . . .

VE:    . . . . On one page, this Dr. Katini indicates that this particular individual could do sedentary work but then, on the next page, it says never climb, balance, stoop, kneel, crouch, crawl, stretch, reach, squat or balance and, you know, I don't care what –

ALJ:    Sedentary, I don't understand.

VE:    Yeah. I don't care whether it's sedentary or any work, if you can't do any of those, that's going to be preclusive. I mean, you're going to have to bend over to – . . . pick up trash or anything during the day and then the other thing that is a real problem is that she – this individual can only sit three hours of eight, walk one hour of eight and stand one hour of eight so that total is only five of eight so that isn't a full-time work load, work day so –

ALJ:    I'm going to change my hypothetical one more time and keeping the

vocational factors the same and, hypothetically, we have an individual who's capable of light exertion, if they were afforded a sit/stand option at jobs and this hypothetical individual would be limited to simple, routine, repetitive jobs that – yeah, it wouldn't take a whole lot of stress as far as, you know, production quotas, et cetera, or dealing with other – well, say other contact, you know, dealing with things rather than people. Any jobs that you can think of that might fit that profile?

VE:     Yes, Your Honor. The office cleaner, 400,000 nationally and 8,000 regionally and hand packer, light, 375,000 nationally, 1,800 regionally. And, Your Honor, I'd reduce those number for the hand packer by half just to meet the – some of those are – . . . more production oriented.

(R. 372-376).

## III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Banas made the following findings:

1.     The claimant met the disability insured status requirements of the Act on March 9, 1999, the date the claimant stated she became unable to work, and has acquired sufficient quarters of coverage to remain insured through at least December 31, 2003.

2.     The claimant has not engaged in substantial gainful activity since March 9, 1999.

3.     The medical evidence establishes that the claimant has chronic low back pain and sprain, an affective disorder, a pain disorder, degenerative disc disease, arthritis, and fibromyalgia, impairments which cause significant vocationally relevant limitations. The claimant also has a non-severe past history of surgery including a hysterectomy, oophorectomy, cholecystectomy and carpal tunnel release (Exhibit 8F). She has also other non-severe conditions including fibrocystic breast disease (Exhibit 8F), osteoporosis (Exhibit 16F), hyperlipidemia and a history of sinusitis.

4.     The severity of the claimant's impairments did not meet any listing prior July 20, 2000. As of July 20, 2000, the claimant's depressive and somatoform disorder met the requirements for 12.04 and 12.07, Appendix 1, Subpart P, Regulations No. 4 and are expected to preclude her from working for at least 12 continuous months (20 C.F.R. §§404.1525 and 416.925) with marked B2 and B3 limitation in the areas of social functioning and concentration, persistence and pace (B3). Prior to July 20, 2000, the claimant's mental impairment included non-severe 12.04 depression with

23

only mild B2 and B3 limitation, and no B1 or B4 limitation. Additionally, the criteria or 12.04(C) are not satisfied.

5.      The claimant's statements concerning her impairments and their impact on her ability to work are not entirely credible as discussed in the body of the opinion, prior to July 20, 2000.

6.      Prior to July 20, 2000, the claimant retained the ability to do a limited range of light level work with a sit-stand option doing low stress, simple routine repetitive work with no production quotas dealing primarily with things, not people.

7.      The claimant was unable to perform her past relevant work as registered nurse from March 9, 1999 through July 19, 2000.

8.      The claimant's capacity for the full range of light work was diminished by her non-exertional imitations as noted in finding five [sic] prior to July 29, 2000.

9.      On March 9, 1999, the claimant was 48 years old, a "younger individual."

10.      The claimant has high school education with college training work experience as a registered nurse. [sic].

11.      The claimant has skilled work experience.

12.      Based on an exertional capacity for light work, and the claimant's age, educational background, and work experience, Sections 404.1569 and 416.969 and Rule 202.21, Table 2, Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion of "not disabled" for the period from March 9, 1999 through July 19, 2000. The same result would be reached without regard to transferability of work skills.

13.      Although the claimant was unable to perform the full range of light work, she was capable of making an adjustment to work existing in significant numbers in the national economy. Such work includes employment as named in the body of this decision. A finding of "not disabled" is therefore reached within the framework of the above-cited rule.

14.      The claimant was not under a disability, as defined in the Social Security Act, at any time from March 9, 1999 through July 19, 2000.

15.      The claimant has been under a disability, as defined in the Social Security Act, since July 20, 2000 (20 C.F.R. §§ 404.1520(d) and 416.920(d)) that is expected to last for at least one year (R. 32-33).

(R. 31-33).

24

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The ALJ failed to employ the dictates of SSR 83-20 when determining the onset of disability in this case.

2. The ALJ failed to consider how Plaintiff's severe and non-severe impairments might combine to render Plaintiff disabled prior to July 20, 2000.

3. The ALJ failed to utilize SSR 96-7p to consider how, prior to July 20, 2000, pain and other symptoms could affect Plaintiff's ability to engage in substantial gainful

25

employment.

4.    The evidence does not support the ALJ's finding that Plaintiff retained the residual functional capacity for light work.

5.    The ALJ failed to properly explain why he concluded that Plaintiff met the listings for 12.04 and 12.07 on July 20, 2000 but not on July 19, 2000 or at any time prior thereto.

6.    The ALJ failed to explain what, if any, weight he gave to the RFC of Plaintiff's treating physician, Dr. Katiny, in arriving at the conclusion that Plaintiff was not disabled at any time prior to July 20, 2000.

7.    The ALJ relied upon an incomplete and inadequate hypothetical question posed to the VE.

Defendant contends:

1.    Substantial evidence supports the ALJ's finding that Plaintiff, prior to July 20, 2000, could perform the light jobs identified by the VE.

2.    Substantial evidence supports the ALJ's decision that Plaintiff's impairments did not meet or equal any of the listed impairments prior to July 20, 2000.

3.    The ALJ properly analyzed the medical evidence and found that Plaintiff retained the RFC to perform light work prior to July 20, 2000.

4.    Substantial evidence supports the ALJ's finding as to Plaintiff's subjective complaints.

## C. Social Security Ruling 83-20

Plaintiff first argues that he ALJ failed to employ the dictates of SSR 83-20 when determining the onset of disability in this case. In SSR 83-20, the Commissioner acknowledged that "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." In the present case, the ALJ determined Plaintiff became disabled as of July 20, 2000. He based this finding on a one-time consultative psychological evaluation performed by James Battisti, M.A. and L. Andrew Steward, Ph.D., in which the psychologists opined Plaintiff met

Listings 12.04 and 12.07. Plaintiff reported depression and being nervous and anxious most of the time. The psychologists found Plaintiff suffered from a pain disorder, mood disorder, anxiety disorder, and personality disorder. The ALJ compared this evaluation with another one-time consultative evaluation performed by Rod McCullough, M.A. and Ronald Pearse, Ed.D., four months earlier. Contrary to the Steward and Battisti opinion, McCullough and Pearse opined Plaintiff's only mental impairment was depression, her social functioning was appropriate, her concentration poor, her persistence good, her pace acceptable, and her memory within normal limits. Subjectively, Plaintiff only reported chronic pain with mild depression on that occasion.

The undersigned finds the ALJ did not err by determining Plaintiff did not meet a mental Listing prior to July 20, 2000. He did not simply pull that date out of thin air, but used the date when the medical evidence first showed Plaintiff had a Listing-level impairment. Substantial evidence supports the ALJ's determination that Plaintiff did not meet a mental Listing prior July 20, 2000, and it is clear to the undersigned that the ALJ based his finding that Plaintiff was disabled on that date but not before solely on his decision that the evidence indicated she met the Listings for mental impairments on that date.

### D. Combination of Impairments Prior to July 20, 2000

Plaintiff next argues the ALJ failed to consider how Plaintiff's severe and non-severe impairments might combine to render Plaintiff disabled prior to July 20, 2000. The ALJ apparently determined Plaintiff's mental impairments, though at Listing level on July 20, 2000, caused absolutely no functional limitations before that date. Although the undersigned finds substantial evidence supports the ALJ's finding that Plaintiff's mental impairments were not at Listing-level severity before July 20, it is improbable that those same impairments caused absolutely no functional

limitations the day before. Even if the ALJ properly found Plaintiff's mental impairments non-severe at that time he was required to consider them throughout the remainder of his decision if they were medically-determinable. 20 CFR § 404.1523

A review of the evidence indicates Plaintiff's depression was a medically-determinable impairment at some point prior to July 20, 2000. Plaintiff's treating physician, Dr. Katiny, diagnosed and treated Plaintiff's depression as far back as 1997. Examining psychologists McCullough and Pearse diagnosed depression in March 2000. Examining physician Dr. Ambroz, to whom the ALJ referred as a diplomate in psychology, also diagnosed depression. McCullough and Pearse added that Plaintiff's depression was affecting her recovery from her back injury. They also found she had "poor" concentration. From a review of the decision, however, it does not appear that the ALJ considered any mental impairment in combination with the physical impairments throughout his decision.

When discussing the Listings, the ALJ stated:

Prior to July 20, 2000, the claimant had no impairment which met the criteria of any of the listed impairments described in Appendix 1 of the Regulations.

Notably, the ALJ did not state whether Plaintiff had "a combination of impairments" which met any Listing, despite the fact that this phrase appears in nearly every ALJ decision. Later in the decision, he stated, "the longitudinal record does not support disability physically or mentally prior to July 2000." Despite McCullough and Pearse's opinion that Plaintiff had "poor" concentration prior to July 2000, the ALJ expressly rejected any limitation based on a mental impairment in his RFC, stating "A reduction based upon a medically established mental impairment is not justified prior to July 20, 2000.

Although the undersigned can find that substantial evidence supports a finding that Plaintiff's

28

mental impairments were not of Listing-level severity before July 20, 2000, the undersigned cannot, without more of an explanation from the ALJ, find that those same Listing-level mental impairments caused absolutely no limitations on July 19, 2000 or before.

The undersigned therefore finds the ALJ did not consider all of Plaintiff's medically-determinable impairments in combination throughout his decision.

### E. Credibility

Plaintiff next argues the ALJ failed to utilize SSR 96-7p to consider how, <u>prior</u> to July 20, 2000, pain and other symptoms could affect Plaintiff's ability to engage in substantial gainful employment. The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20

C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594. Plaintiff first argues in this regard that the ALJ failed to make the threshold determination as to whether there was objective or clinical evidence of a condition or conditions that might cause the pain and symptoms complained of. A review of the ALJ's decision shows the ALJ did not expressly make the step-one (threshold) determination. Defendant, however, contends:

> The ALJ clearly referenced the above standard in his credibility analysis (Tr. 27-28). The fact that the ALJ did not specifically state that he found that Plaintiff had impairments that could reasonably be expected to produce pain or other symptoms under the first prong of the analysis is completely irrelevant, as the ALJ could not have conducted the second portion of the analysis without that finding. Since the ALJ plainly completed the second portion of the analysis, his omission of such a specific statement under the first prong is harmless error in this case.

(Defendant's brief at 14). The Fourth Circuit does not agree with Defendant's position, however. In Craig, the Fourth Circuit found that the ALJ properly weighed the opinions of the treating physicians, properly considered Craig's therapist's report, adequately developed the record despite Craig's pro-se status, and properly considered all relevant evidence in assessing Craig's RFC. Id. at 589-91. Nevertheless, the Court found that the ALJ failed to "expressly consider the threshold question of whether Craig had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain she alleges." Id. at 596. The Court then held that the ALJ must determine whether the objective evidence could reasonably be expected to produce "the actual pain, in the amount and degree, alleged by the claimant." Id. at 594.

Here, the ALJ found that Plaintiff suffered severe chronic low back pain and sprain, an affective disorder, a pain disorder, degenerative disc disease, arthritis, and fibromyalgia. He also found she had a past history of surgery including hysterectomy, oophorectomy, cholecystectomy and carpal tunnel release, as well as diagnoses of fibrocystic breast disease, osteoporosis, hyperlipidemia,

and history of sinusitis. Nevertheless, he did not make an express finding as to whether Plaintiff

suffered any impairment or combination of impairments that could reasonably be expected to result

in her alleged symptoms. Instead, he "proceeded directly to considering the credibility of

[Plaintiff's] subjective allegations of pain." Craig, supra, at 596 (R. 19-20). In Craig, the ALJ also

found severe impairments at step two of the sequential analysis, yet the Fourth Circuit held that the

identification of severe impairments was not an explicit step-one determination for purposes of the

pain analysis. Therefore, the ALJ's finding of severe impairments and his evaluation of the second-

step criteria do not constitute an adequate step-one finding under Craig.

The undersigned notes there is a serious split within the Fourth Circuit regarding this issue.

The Southern District of West Virginia has held that an ALJ "must expressly consider the threshold

question" of whether the Claimant has an impairment that could cause symptoms resulting in pain.

Hill v. Commissioner, 49 F. Supp. 2d 865 (S.D.W.Va. 1999). That Court rejected the

Commissioner's arguments that: 1) "the ALJ did in fact 'explicitly' perform a part 1 pain analysis

by acknowledging that Claimant's impairments could and did in fact cause headaches and

dizziness;" and 2) "the ALJ 'implicitly' performed a part 1 pain analysis by evaluating the actual

functional limitations caused by Claimant's impairments." Id. at 868-869. Other district courts

within the Fourth Circuit, however, have held that the ALJ did not err in failing to meet the first step

of the two-step pain analysis under Craig, if he 1) implicitly performed a part 1 pain analysis or 2)

otherwise thoroughly evaluated both the objective evidence and the subjective complaints. See, e.g.,

Pittman v. Massanari, 141 F. Supp. 2d 601 (N.D.N.C. 2001), which states:

> The record contains evidence of Plaintiff's post-tibial fracture bony defect-- a
> condition which *could* reasonably be expected to produce some of the pain claimed
> by Plaintiff--and thus the ALJ essentially found that Plaintiff could satisfy the first
> prong of the test articulated in *Craig*. However, the ALJ evaluated the "intensity and

persistence of his pain, and the extent to which it affects his ability to work," and essentially found Plaintiff's subjective description of his limitations not credible.

(Emphasis added). See also Perkins v. Apfel, 101 F.Supp.2d 365, 373 (D. Md. 2000), and Ketcher v. Apfel, 68 F.Supp.2d 629, 650-52 (D. Md. 1999). In Ketcher, the Court found:

> Although the ALJ did not specifically state that the claimant's alleged pain could result from these medically determined impairments, it is clear that the ALJ made this determination since he noted that the impairments were "severe" and affected his functional capacity. Even if the ALJ failed to make an express finding at step one of the pain analysis, the ALJ correctly applied step two of the analysis.

Id. at 651 (internal citations omitted). These arguments are similar to the argument the Commissioner makes here. The undersigned finds, however, that the Fourth Circuit in Craig imposed on the ALJ the duty to expressly state whether the objective evidence shows an impairment that could cause the claimant's claimed symptoms at step one of the pain analysis. 76 F.3d at 596. Indeed, the Craig Court held that "the ALJ's consideration of the medical evidence was more than adequate." 76 F.3d at 591. The Court further found that the ALJ had reviewed all of the medical records "in painstaking detail." Id. at 592. Regardless of the ALJ's competent examination of the evidence, however, the Court found his decision inadequate because he failed to address the threshold question in the pain analysis.

The undersigned therefore finds substantial evidence does not support the ALJ's credibility analysis.

## F. RFC

Plaintiff next argues the evidence does not support the ALJ's finding that Plaintiff retained the residual functional capacity for light work. Dr. Katiny, the treating physician, opined that Plaintiff could do only limited sedentary work. Examining physician Dr. Zahir also found Plaintiff could work at the sedentary level. Examining physician Dr. Ambroz noted Plaintiff had a perceived

ability to do sedentary/light work, which perception he found consistent with her physical findings. The ALJ then noted that the two State agency reviewing physicians opined Plaintiff could work at the medium level, and stated:

> In view of the evidence of record from the consulting physicians and psychologists, and considering the objective findings longitudinally, the Administrative Law Judge is convinced that the claimant retained the ability to do light level work.

(R. 29). The undersigned does not find this explanation sufficient under the Regulations. The ALJ apparently rejected every doctor's opinion as to Plaintiff's exertional limitations, and decided on his own that she could work at the light exertional level.

In addition, treating physician Dr. Katiny opined Plaintiff could never climb, balance, stoop, kneel, crouch, crawl, stretch, reach, squat or bend, and must avoid machinery, excessive humidity, cold, and environmental hazards. Examining physician Dr. Zahir opined Plaintiff would need to avoid frequent bending, stooping, heavy lifting, pushing or pulling. Even State agency reviewing physician Franyutti opined Plaintiff was limited to frequent climbing, balancing, stooping, kneeling, crouching, and crawling, and should avoid concentrated exposure to cold, and State agency reviewing physician Brown opined Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl. Yet the ALJ did not include any postural or environmental limitations in his RFC or his hypothetical to the VE and did not explain why he rejected all these limitations.

The undersigned therefore finds substantial evidence does not support the ALJ's RFC.

### G. Listings 12.04 and 12.07 prior to July 20, 2000

Plaintiff next argues the ALJ failed to properly explain why he concluded that Plaintiff met the Listings for 12.04 and 12.07 on July 20, 2000 but not on July 19, 2000 or at any time prior thereto. As already discussed above, the undersigned finds the ALJ adequately explained why he

concluded that Plaintiff did not meet Listings 12.04 and 12.07 prior to July 20, 2000.

## H. Dr. Katiny's RFC

Plaintiff next argues the ALJ failed to explain what, if any, weight he gave to the RFC of Plaintiff's treating physician, Dr. Katiny, in arriving at the conclusion that Plaintiff was not disabled at any time prior to July 20, 2000. It is indisputable that Dr. Katiny was Plaintiff's treating physician. "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

A review of the decision indicates the ALJ expressly accorded Dr. Katiny's opinion little and/or minimum weight, finding it "inconsistent with other significant medical evidence in the record up until July 20, 2000" (R. 29). He further explained: "The disability determination specialists found that the claimant was capable of performing medium level work (Exhibit 18F and Exhibit 20F) and only non-severe mental impairment was documented." The undersigned finds the ALJ's explanation for his near-total rejection of the treating physician's opinion does not suffice under 20 C.F.R. § 404.1527, which provides:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined

you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and

testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(Emphasis added). The undersigned finds the ALJ did not follow the dictates of the Regulation in applying the factors or in giving reasons for the weight he accorded Dr. Katiny's opinion.

The undersigned therefore finds substantial evidence does not support the ALJ's treatment of Dr. Katiny's report.

## I. Hypothetical to the VE

Plaintiff next argues the ALJ relied upon an incomplete and inadequate hypothetical question posed to the VE. The undersigned has already determined that substantial evidence does not support the ALJ's RFC or his resulting hypothetical to the VE.

## J. Physical Listings

Plaintiff finally argues that the ALJ failed to make any reasoned analysis of the Plaintiff's impairments and symptoms to the criteria of the listings, particularly with regard to the diagnosis of fibromyalgia and rheumatoid and osteoarthritis. In Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986), the Fourth Circuit held that the ALJ should first identify the relevant listed impairments. He should then compare each of the listed criteria to the evidence of the plaintiff's symptoms. In the case at bar, the ALJ found Plaintiff met Listings 12.04 and 12.07 as of July 20, 2000. He then properly compared the mental listings to Plaintiff's alleged mental impairments occurring before July 20, 2000. The ALJ found that Plaintiff also had severe physical impairments, including chronic low

36

back pain and sprain, degenerative disc disease, arthritis, and fibromyalgia. The ALJ did not, however, identify any Listings relevant to any of these physical impairments and compare the criteria to the evidence of Plaintiff's symptoms. He noted only that two examining physicians found no neurological deficits of significance and one opined she had a normal gait. He then stated:

> Thus, from a physical perspective, the claimant has not shown an impairment sufficient to meet the criteria of Listing 1.00 et seq. (20 C.F.R., Part 404, Subpart P, Appendix 1) in the relevant period.

The undersigned finds this analysis insufficient under Cook.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI . I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 12] be **DENIED** and Plaintiff's Motion for Summary Judgment [Docket Entry 9] be **GRANTED in part** by reversing the Commissioner's decision pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984),

cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___15___ day of February, 2006.

_____
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE